SMS LAW GROUP, LLP
Adi Sarbaz, Bar No. 263784
Kian Moghbeli, Bar No. 275514
Arash Sarbaz, Bar No. 302196
7360 Santa Monica Blvd., Suite 200
West Hollywood, CA 90046
Telephone: 310-401-1662

Kaveh Navab (SBN: 280235)
**NAVAB LAW**
13160 Mindanao Way, Suite 280
Marina Del Rey, California 90292
Email: navablaw@gmail.com

Attorneys for Plaintiff,
MICHAEL WALIS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL WALIS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIAN FERNANDEZ, AN INDIVIDUAL; JONATHAN KATZ, AN INDIVIDUAL; RICHARD WASERSTEIN, AN INDIVIDUAL; CLAUDIO FERNANDEZ, AN INDIVIDUAL; FACILITY PRO, INC., A FLORIDA CORPORATION; MAINTENANCE PRO SERVICES LA, INC., A CALIFORNIA CORPORATION; ALTRUISTIC STAFFING CORP, INC., A FLORIDA CORPORATION AND DOES 3-10<br><br>Defendants. | CASE NO. 2:16-cv-00467-RGK-JEM<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>(1) BREACH OF ORAL CONTRACT;<br>(2) FRAUD AND DECEIT BASED ON INTENTIONAL MISREPRESENTATION (Cal. Civ. Code 1710 et. Seq.);<br>(3) NEGLIGENT MISREPRESENTATION;<br>(4) BREACH OF FIDUCIARY DUTY;<br>(5) CONSTRUCTIVE FRAUD CC §1573;<br>(6) FRAUDULENT DECEPTION CC §1572(5);<br>(7) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br>(8) ALTERNATIVELY FOR UNJUST ENRICHMENT |

# I. COMPLAINT

COMES NOW, Plaintiff MICHAEL WALIS, who alleges, as follows:

## PARTIES

1. Plaintiff MICHAEL WALIS, (hereinafter "Plaintiff" or "Walis") is now, and at all times mentioned in this complaint, is an individual residing in Los Angeles, California.

2. Defendant, Christian Fernandez (hereinafter "Fernandez") is an individual, and on information and belief, doing business in the County of Los Angeles, California.

3. Defendant, Jonathan Katz (hereinafter "Katz") is an individual, and on information and belief, doing business in the County of Los Angeles, California.

4. Defendant, Richard Waserstein (hereinafter "Waserstein") is an individual, and on information and belief, doing business in the County of Los Angeles, California.

5. Defendant, Claudio Fernandez (hereinafter "Claudio") is an individual, and on information and belief, residing in Florida doing business in the County of Los Angeles, California.

6. Defendant, Facility Pro Inc. (hereinafter "Facility Pro") is a Florida corporation and doing business in the County of Los Angeles, California.

7. Defendant Facility Pro Inc. is, and at all times since its incorporation/formation was, the alter ego of Fernandez, Katz, Waserstein, Claudio and DOES 3-10 and each other and there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Fernandez, Katz, Waserstein, Claudio and Facility Pro Inc., such that any individuality and separateness between Fernandez, Katz, Claudio and Facility Pro Inc. have ceased, and Fernandez, Katz, Waserstein, Claudio are the alter ego of Facility Pro Inc. in that Fernandez, Katz, Waserstein, Claudio and completely controlled, dominated, managed and operated Facility Pro Inc. since its formation or incorporation for their

own personal benefit and continue to do so to this day.

8. Defendant Facility Pro Inc. is, and at all times since its incorporation/formation was, a mere shell, instrumentality and conduit through which said Defendants, Fernandez, Waserstein, Katz, Claudio and DOES 3-10 carried on their own activities in the corporate or limited liability company name, exercising such complete control and dominance of the activities of each other, to such an extent, that any individuality or separateness of each of said entities and Defendants, Fernandez, Waserstein, Katz, Claudio and DOES 3-10 does not, and at all relevant times herein, did not exist. Facility Pro Inc. made the barest pretense of adherence to corporate and/or limited liability company formalities. Plaintiff is informed and believes and thereon alleges that the entity did not maintain proper records.

9. Plaintiff is informed and believes and thereon alleges that adherence to the fiction of the separate existence of Facility Pro Inc. as an entity distinct and apart from Fernandez, Waserstein, Katz and Claudio and DOES 3-10 would permit an abuse of the corporate privilege and would sanction fraud or promote injustice in that Defendants, used Facility Pro Inc. as a means of causing the damage to Plaintiff as alleged herein. Defendant Fernandez, and Facility Pro Inc. are herein collectively referred to as "Fernandez" and at all times relevant Fernandez was acting on behalf of his partners Waserstein, Katz and Claudio.

10.Defendant, Maintenance Pro Services LA, Inc. (hereinafter "Maintenance Pro") is a California corporation doing business in the County of Los Angeles, California. Plaintiff is informed and believes and thereon alleges that Maintenance Pro is, and at all times since its incorporation/formation was, the alter ego of Fernandez Waserstein, Katz and Claudio and DOES 3-10 and each other and there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Fernandez, Waserstein, Katz and Claudio and Maintenance Pro, such that any individuality and separateness between Fernandez Waserstein, Katz,

Claudio and Maintenance Pro have ceased, and Fernandez, Waserstein, Katz and Claudio are the alter ego of Maintenance Pro in that Fernandez, Waserstein, Katz and Claudio, and completely controlled, dominated, managed and operated Maintenance Pro since its formation or incorporation for his/their own personal benefit and continue to do so to this day.

11. Maintenance Pro is, and at all times since its incorporation/formation was, a mere shell, instrumentality and conduit through which said Defendants, Fernandez, Waserstein, Katz, Claudio and DOES 3-10 carried on their own activities in the corporate or limited liability company name, exercising such complete control and dominance of the activities of each other, to such an extent, that any individuality or separateness of each of said entities and Fernandez, Waserstein, Katz and Claudio and DOES 3-10 does not, and at all relevant times herein, did not exist. Maintenance Pro made the barest pretense of adherence to corporate and/or limited liability company formalities. Maintenance Pro was incorporated and operated in a similar manner to all other corporations and businesses run by Fernandez, Waserstein, Katz and Claudio. Plaintiff is informed and believes and thereon alleges that the entity did not maintain proper records.

12.That adherence to the fiction of the separate existence of Maintenance Pro as an entity distinct and apart from Fernandez, Waserstein, Katz and Claudio and DOES 3-10 would permit an abuse of the corporate privilege and would sanction fraud or promote injustice in that Defendants Fernandez, Waserstein, Katz and Claudio, used Maintenance Pro as a means of causing the damage to Plaintiff as alleged herein. Plaintiff was led to believe that he had an ownership interest in Maintenance Pro; however Defendants Fernandez, Waserstein, Katz and Claudio were always the true owners of Maintenance Pro. Plaintiff had zero ownership interest and/or control in the company and was easily pushed aside when Defendants decided that his services were no longer required. Defendants Fernandez, Waserstein, Katz and Claudio and Maintenance Pro are herein

collectively referred to as "Fernandez" and at all times relevant Fernandez was acting on behalf of his partners Waserstein, Katz and Claudio.

13. Defendant, Altruistic Staffing Corp, Inc. (hereinafter "Altruistic") is a Florida corporation, registered in California and doing business in the County of Los Angeles, California.

14. Altruistic is, and at all times since its incorporation/formation was, the alter ego of Fernandez, Defendants Fernandez, Waserstein, Katz and Claudio and DOES 3-10- and each other and there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendants Fernandez, Waserstein, Katz and Claudio and Altruistic, such that any individuality and separateness between Defendants Fernandez, Waserstein, Katz and Claudio and Altruistic have ceased, and Defendants Fernandez, Waserstein, Katz and Claudio are the alter egos of Altruistic in that Defendants Fernandez, Waserstein, Katz and Claudio are the sole members of Altruistic, and completely controlled, dominated, managed and operated Altruistic since its formation or incorporation for his/their own personal benefit and continue to do so to this day.

15. Altruistic is, and at all times since its incorporation/formation was, a mere shell, instrumentality and conduit through which said Defendants, Fernandez, Waserstein, Katz, Claudio and DOES 3-10 carried on their own activities in the corporate or limited liability company name, exercising such complete control and dominance of the activities of each other, to such an extent, that any individuality or separateness of each of said entities and Defendants Fernandez, Waserstein, Katz and Claudio and DOES 3-10 do not, and at all relevant times herein, did not exist. Altruistic made the barest pretense of adherence to corporate and/or limited liability company formalities. Plaintiff is informed and believes and thereon alleges that the entity did not maintain proper records.

16. Plaintiff is informed and believes and thereon alleges that adherence to the fiction of the separate existence of Altruistic as an entity distinct and apart from

Fernandez, Waserstein, Katz and Claudio and DOES 3-10 would permit an abuse of the corporate privilege and would sanction fraud or promote injustice in that Defendants Fernandez, Waserstein, Katz and Claudio, used Altruistic as a means of causing the damage to Plaintiff as alleged herein. Defendants Fernandez, Waserstein, Katz and Claudio and Altruistic are herein collectively referred to as "Fernandez" and at all times relevant Fernandez was acting on behalf of his partners Waserstein, Katz and Claudio.

## GENERAL ALLEGATIONS

17. Facility Pro Inc., Maintenance Pro, and Altruistic are jointly and severely liable for each other's negligence, conduct and wrongdoing as alleged herein, in that:

a. Facility Pro Inc., Maintenance Pro, and Altruistic operate as a single business enterprise for the purpose of effectuating and carrying out Maintenance Pro, and/or Altruistic business operations for the benefit of Facility Pro Inc.

b. Facility Pro Inc., Maintenance Pro, and Altruistic do not operate as completely separate entities, but rather, integrate their resources to achieve a common business purpose.

c. Maintenance Pro and Altruistic are so organized and controlled, its decisions, affairs and business so conducted as to make it a mere instrumentality, agent, conduit, or adjunct of Facility Pro Inc.

d. Facility Pro Inc.'s income contribution results from function integration centralization of management and economies of scale with Maintenance Pro and Altruistic.

e. Defendants' officers and management are intertwined and do not act completely independent of one another.

f. Defendants' officers and managers act in the interests of Facility Pro Inc., Maintenance Pro and Altruistic as a single enterprise.

g. Facility Pro Inc. has control and authority to choose and appoint

Maintenance Pro and Altruistic's board members as well as its other top officers and managers.

h. Despite all being maintenance companies, Defendants do not compete with one another, but have been structured and organized and business effectuates so as to create a synergistic, integrated single enterprise where various components operate in concert with one another.

i. Facility Pro Inc., through Defendants Fernandez, Waserstein, Katz and Claudio maintains unified administrative control over Maintenance Pro and Altruistic.

j. Defendants are insured by the same carriers and provide uniform or similar pension, health, life, and disability insurance plans for employees.

k. Defendants have unified 401(k) plans, pensions, and investment plans, bonus programs, vacation policies, and paid time off from work schedules and policies.

l. Defendants have unified personnel policies and practices and/or a consolidated personnel organization or structure.

m. Maintenance Pro and Altruistic have unified accounting policies dictated by Facility Pro Inc., and /or common integrated accounting organization or personnel.

n. Facility Pro Inc.'s officers, directors, and other members of management make policies and decisions to be effectuated by Maintenance Pro and Altruistic and/or otherwise play roles in providing directions and making decisions for Maintenance Pro and Altruistic.

o. Facility Pro Inc.'s officers, directors, and other management, including Defendants Fernandez, Waserstein, Katz and Claudio direct certain financial decisions for Maintenance Pro and Altruistic including the amount and nature of capital outlays.

p. Facility Pro Inc.'s written guidelines, policies and procedures control

Maintenance Pro and Altruistic, its employees, policies and practices.

q. Facility Pro Inc.'s files consolidated earnings statements factoring all revenue and losses from Maintenance Pro and Altruistic as well as consolidated tax returns, including those seeking tax relief.

r. Facility Pro Inc. directs and controls Maintenance Pro and Altruistic's relationships with, requests to, and responses to inquiries for business.

s. Maintenance Pro was the Southern California operations for Altruistic and Facility Pro.

t. Employees at all levels were continually shifted from, interchanged and intermingled between Facility Pro Inc., Maintenance Pro, and Altruistic continually, with no regard for any employment formalities.

u. Defendants Fernandez, Waserstein, Katz and Claudio would recruit, hire and train employees for Facility Pro Inc., Maintenance Pro, and Altruistic throughout Southern California.

18. At the direction of Defendants Christian Fernandez and Johnathan Katz, Altruistic employee and manager, Khristeene Sealey, was paid to move out from Florida to Los Angeles, in March of 2015 in order to help manage and assist the business operations of Facility Pro Inc., Maintenance Pro, and Altruistic. Khristeen Sealey assisted and managed business operations for Facility Pro Inc., Maintenance Pro, and Altruistic out of the same office located in the Hollywood, CA.

19. At all times that Khristeene Sealey was living in the Los Angeles area and assisting with and managing business operations for Facility Pro Inc., Maintenance Pro, and Altruistic she was trained, directed, controlled and employed by Defendants Christian Fernandez and Johnathan Katz, whom she would report to throughout her employment about operations in Los Angeles. During this time Khristeen Sealey was paid by Facility Pro Inc., Maintenance Pro, and Altruistic, as reflected in her 2015 W-2 forms. **SEE EXHIBIT 1**. Indeed, during the time that

Khristeen Sealey was living in Los Angeles her housing was provided to her by and paid for by Defendants Christian Fernandez and Johnathan Katz. This was done by Defendants Christian Fernandez and Johnathan Katz in furtherance of their interests in Facility Pro Inc., Maintenance Pro, and Altruistic.

20. Throughout 2015, Defendant Johnathan Katz traveled to Los Angeles on numerous occasions to train the personnel and employees of Facility Pro Inc. and Maintenance Pro on sales and management, including but not limited to Kristeen Sealey. Defendant Johnathan Katz was exclusively responsible for recruiting, hiring and training personnel and employees of Facility Pro Inc. and Maintenance Pro on sales related matters.

21. Employees of Facility Pro Inc. and Maintenance Pro would have their daily employment schedules set by Defendants Christian Fernandez and Johnathan Katz.

22. On one occasion in approximately February of 2015, Plaintiff accompanied Defendants Christian Fernandez and Johnathan Katz to the Smart & Final headquarters in Commerce, CA where Defendants Christian Fernandez and Johnathan Katz were making a presentation on behalf of Maintenance Pro in order to secure Smart & Final as a client for their business. During their presentation to Smart & Final, Defendant Johnathan Katz held himself out to be President of Maintenance Pro. This was also done in an effort by Defendant Johnathan Katz to train Plaintiff on how Defendant Johnathan Katz wanted Plaintiff to run the sales aspect of Maintenance Pro. Due to the fact that Defendants Johnathan Katz, Claudio Fernandez, Christian Fernandez, and Richard Waserstein operated these businesses as one entity; any differences in titles, positions and/or names of the companies were fungible as they existed merely in name alone.

23. On one occasion in approximately March of 2015, Plaintiff accompanied Defendants Christian Fernandez and Johnathan Katz to The Grove Shopping Center in Los Angeles, during which time, Defendants Christian Fernandez and Johnathan Katz presented a five hour demonstration on behalf of Maintenance Pro to

representatives of the The Grove Shopping Center in an effort to secure them as a customer for their business. During this demonstration to representatives of The Grove Shopping Center, Defendant Johnathan Katz once again held himself out to be President of Maintenance Pro. This was also done in an effort by Defendant Johnathan Katz to train Plaintiff on how Defendant Johnathan Katz wanted Plaintiff to run the sales aspect of Maintenance Pro.

24. During their visits to Los Angeles, Defendants Christian Fernandez and Johnathan Katz would recruit, train, manage and control employees of Maintenance Pro in furtherance of their interest in the company, as well as the interests of Defendants Claudio and Wasertein.

25. In the summer of 2015, when Plaintiff was being pushed out of Maintenance Pro, Defendant Johnathan Katz and Plaintiff met at the corporate office in Hollywood, CA, and Defendant Johnathan Katz informed Plaintiff that he would make Plaintiff whole as to any money that was owed to him from Maintenance Pro.

26. At all times Defendant Christian Fernandez acted and was the agent of Defendants Waserstein, Katz and Claudio in that Fernandez negotiated with Plaintiff in an effort to further the business and propriety interests of Defendants Waserstein, Katz and Claudio.

27. Maintenance Pro employees such as Khristeene Sealey and Jermaine Woods, who was also a manger, were informed by Defendant Christian Fernandez and Johnathan Katz that Defendant Wasertein was the investor and funder of Maintenance Pro and Facility Pro and that they were acting on Defendant Wasertein's behalf in his financial interest.

28. On October 26, 2014, Defendant Johnathan Katz wrote an email to Claudio Fernandez, regarding Maintenance Professionals of South Florida (an entity that on information and belief was dissolved in 2012), requesting that Claudio Fernandez return the $18,000 he took out of the business account. This was a clear breach of corporate formality by Claudio Fernandez. **SEE EXHIBIT 2.**

29. In the same email on October 26, 2014, Claudio Fernandez accused his son Christian Fernandez of stealing money from the corporations that they owned. In the same email Christian Fernandez replies, with an email from Altruistic, that “I did not steal any money”. Claudio Fernandez in the same email states that he does not have a clear picture of the “California LA” operation, further stating that he “feel[s] betrayed on the issues that [he] caught many times in the past.” Claudio Fernandez goes on to say that “Christian…you created all this with unfair business practices when it comes to accountability in finances of the company.” Moreover, in the email Johnathan Katz responds that “**the money Christian withdrew was accounted for he had to send Mike money as well as reimburse himself money for payroll he funded with his personal money.”** Plaintiff believes this type of action was customary for Christian Fernandez and his control and management of Facility Pro Inc., Maintenance Pro and Altruistic. This also further demonstrates the commingling of funds and money between all Defendants. **SEE EXHIBIT 2.**

30. On at least one occasion Altruistic used the workers compensation insurance of Maintenance Pro.

31. Funds were often wired from Facility Pro Inc., Maintenance Pro, and Altruistic to one another to cover financial shortcomings and thus funds were routinely commingled between all said companies.

32. On April 10, 2014, Danielle L. Muzac, the Director of Financial Operations for Altruistic, sent an email to Defendant Claudio asking him to “send me an expense report relevant to California”. Defendant Christian Fernandez then responds to the email, while cc’ing Defendant Claudio and Plaintiff, stating that “[a]lso we need all of Mike’s (Plaintiff) expenses”. This is indicative of the commingling of funds, expenses, ignoring of corporate formalities between Altruistic and Maintenance Pro for the California operations that Defendants Fernandez, Waserstein, Katz and Claudio were running. In other words, expenses related to Maintenance Pro, which was the California operation of the Defendants’

business, was managed, controlled and charged to Altruistic, in Florida. The reason for this was that Defendants Fernandez, Waserstein, Katz and Claudio were the sole actual managers, operators and owners of Facility Pro Inc., Maintenance Pro, and Altruistic. **SEE EXHIBIT 3.**

33. Based on corporate filings in Florida, Defendants Fernandez, Waserstein, Katz opened up a company named Sweepmaster Sweeping Service, Inc, in 1999 together, with Defendant Claudio Fernandez being named the President, Secretary, Treasurer and Director. In May of 2014, the Company name was changed to Facility Pro, Inc., and now the President was Johnathan Katz, Claudio Fernandez was the Vice President, Christian Fernandez was the Secretary and Defendant Richard Waserstein was named the Treasurer. **SEE EXHIBIT 4.** At some point later Defendants created a separate entity named Facility Pro Nevada Inc. **SEE EXHIBIT 1.**

34. These corporate filings evidence the pattern by which Defendants Fernandez, Claudio, Katz and Waserstein operate their business. Defendants Fernandez, Claudio, Katz and Waserstein, in essence, run a singular business, concentrating in the maintenance industry, in different locations. The business names are interchangeable and are therefore changed with some regularity. In furtherance of their business interest, to date, Defendants Fernandez, Katz, Claudio, and Waserstein have created, at the minimum, the following companies, Facility Pro, Maintenance Pro, Altruistic, Facility Pro Nevada, Inc., Sweepmaster Sweeping Service, Inc., etc. The roles of the parties remain constant, such as Waserstein being the primarily investor. However, the titles that the Defendants Fernandez, Katz, Claudio and Waserstein give to each other are changed from time to time. As an example, in the filings, Claudio is initially the President then later Katz becomes President. The other titles and positions in the company are also changed as they are merely titles in name alone and are therefore fungible.

35. Similarly, as the incorporator, when Christian Fernandez incorporated

Maintenance Pro in California, he decided on what titles to bestow on whom, including giving himself the title of Treasurer. Plaintiff was given the title of President, however as is the pattern in the business operations of Defendants Fernandez, Katz, Claudio and Waserstein, the title is meaningless. Defendants wanted to set up their business in California, and Plaintiff was lured into doing the work for them with promises of an ownership interest. Maintenance Pro, whether the name had been conceived or not, was always the Southern California operation for Defendants Fernandez, Katz, Claudio and Waserstein; and it was the subject of the negotiation from the outset of talks between Plaintiff and Defendants. Nevertheless, Plaintiff was never given a true ownership interest, and when it came time he was pushed out. Then, as they had done with Sweepmasters prior, Defendants Fernandez, Katz, Claudio and Waserstein simply changed the name of the operation. Employees, such as Jermaine Woods, were kept on; but the paychecks were now coming from a Facility Pro.

36. Plaintiff is informed and believes and on that basis alleges, that when a employee got injured on a job site the release agreement written by Christian Fernandez and given to the employee included a release for all the companies Facility Pro Inc., Maintenance Pro and Altruistic.

37. Plaintiff is informed and believes and on that basis alleges, that at all times mentioned in this complaint, Defendants were the agent, employee, partner, joint venture, and/or co-conspirator of the remaining Defendants and in doing the things alleged in this complaint were acting within the course and scope of that agency, employment, partnership, joint venture and/or conspiracy.

38. Plaintiff, Michael Walis, and Defendant, Christian Fernandez, met each other approximately 11 years ago when they were working together in the loan business in Florida.

39. Over the years, despite the fact that Walis moved to California, Walis and Fernandez remained close friends. By way of example of this close friendship, on

one occasion when Fernandez ran into hard times with the law, Walis was there to assist Fernandez and his family with financial support until Fernandez was back on his feet and able to repay him.

40. Defendant, Fernandez, along with his three partners, Jonathan Katz, Richard Wasserstein, and Claudio Fernandez, operate a facility maintenance service business in the state of Florida known as Facility Pro, Inc. The Facility Pro, Inc. website indicates that the company has over 20 years of experience in the facility service maintenance business and lists some of the services they provide which include; landscaping, pressure washing, janitorial, concrete polishing, street sweeping, stripping and waxing, apartment turnover, water recover & remediation, handymen & porter, and food service. Facility Pro, Inc. has been primarily servicing the Florida area.

41. Fernandez had been interested in taking advantage of the opportunities present in the facility maintenance service market in the Los Angeles area, which would come to be named Maintenance Pro.

42. In or about 2011, Fernandez, first approached Walis and asked Walis if he was interested in working with him in entering the facility maintenance service business in Los Angeles. After some consideration, Walis informed Fernandez that he is not interested. At all times, the intent of Fernandez was to create a California operation for the business that was operated by Defendants Fernandez, Claudio, Katz, and Waserstein. This California operation would go by different names including but not limited to Maintenance Pro, Facility Pro, etc. As such, whether the name existed at the time of the initial meeting between Walis and Fernandez, on behalf of Defendants Fernandez, Claudio, Katz, and Waserstein is irrelevant.

43. Over the next year or so, Fernandez persistently tried to convince Walis of entering the facility maintenance service business in the southern California area. Time and time again, Walis informed Fernandez that he was not interested in the facility maintenance service business. However, Fernandez did not relent, and in

February of 2014, Fernandez decided to come out to Los Angeles to meet with Walis personally and further sell him on the idea of entering the facility maintenance service business in the southern California area,

44. During their first meeting in Los Angeles, Fernandez and Walis went to a Wal-Mart in the Pico Rivera area of Los Angeles to meet with the store manager about their facility maintenance service business and the manager seemed receptive to the idea of working with a new group. The next day, Fernandez and Walis stopped by another Wal-Mart in the Crenshaw area of Los Angeles to speak with the manager about their maintenance service. Walis did most of the talking at this meeting and the manager seemed receptive to working with a new group in regards to this facility maintenance service business.

45. After meeting with the two Wal-Mart managers and witnessing the potential for success in growing a facility maintenance service business in Los Angeles, Walis became interested in the business. However, despite his interest, Walis was concerned about doing business with a friend because he valued Fernandez's friendship and did not want to mix friendship and business. Fernandez assured Walis there was nothing to worry about because they would have a fair arrangement and everything would be fine.

46. Given that Fernandez lived in Florida, he needed someone willing to run the operation in Los Angeles (referred to as the "Los Angeles facility maintenance service business") and take on the financial risk of starting in a new market. In exchange, Fernandez would provide general support and guidance from the experience he had gained in the maintenance service business in Florida.

**TERMS OF THE ORAL AGREEMENT FOR THE LOS ANGELES FACILITY MAINTENANCE SERVICE BUSINESS**

47. The initial joint venture proposed by Fernandez, on behalf of Defendants Fernandez, Claudio, Katz, and Waserstein for the Los Angeles facility maintenance service business was similar to that of a franchise agreement in which Walis would

own and operate the Los Angeles facility maintenance service business and pay a commission fee to Fernandez based on the gross revenues. On or about, February 14, 2014, Walis and Fernandez orally agreed in Los Angeles, California, to the terms of the Los Angeles facility maintenance service business to be performed in Los Angeles. The terms of the partnership were originally defined by the oral agreement for the Los Angeles facility maintenance service business joint venture (the "Oral Agreement") were as follows:

a. Walis will provide the financial capital for the Los Angeles facility maintenance service business, including the startup costs of the business and the ongoing expenses such as machinery and salaries. In addition, Walis will oversee and manage the business with support from Fernandez;

b. Fernandez and his partners will provide general support for the Los Angeles facility maintenance service business based on his experience;

c. Fernandez and his partners will be entitled to a 12% commission of the monthly gross revenue of the Los Angeles facility maintenance service business;

d. Walis will be entitled to any profits that the Los Angeles facility maintenance service business generates.

48. When Fernandez and his partners entered into this agreement with Walis, he was acting on behalf of himself and his three partners; Jonathan Katz, Richard Waserstein and Claudio Fernandez. Defendants' Katz, Waserstein and Claudio had been operating Facility Pro, Inc, in Florida and were eager to enter the Los Angeles market and had Defendant Christian Fernandez act as their agent and enter into an agreement with Plaintiff.

49. When this Agreement was entered into in Los Angeles, CA, the Los Angeles facility maintenance service business was providing Wal-Mart with services related to the cleaning of their interior floors.

50. On or about March 25, 2014, Fernandez applied to form a California corporation by the name of Maintenance Pro Services LA, Inc. Maintenance Pro

Services LA, Inc. was filed with the California Secretary of State on April 16, 2014. Defendant's Katz, Waserstein and Claudio were aware of the formation of Maintenance Pro Services and helped facilitate it. Defendant Katz would recruit, hire and train employees who worked for Maintenance Pro.

51. On April 16, 2014 Fernandez personally paid the filing fees and filed the Articles of Incorporation for Maintenance Pro Services signing as the sole incorporator of the California Corporation.

52. During the first couple of months that the Los Angeles facility maintenance service business was operating, Walis funded and paid for all expenses directly by personal checks written from his personal banking account.

53. When Maintenance Pro Services LA, Inc. was formed by Fernandez, Fernandez led Walis to believe that Walis was going to be sole owner of Maintenance Pro Services LA, Inc. When Maintenance Pro Services LA was formed, Fernandez listed Walis as the President and Director and listed himself, Fernandez, as the Secretary and Treasurer. The initial entity address with the California Secretary of State for Maintenance Pro Services LA was Fernandez's home address of 6631 NE 21 Fort Lauderdale, FL 33308**SEE EXIBIT 5**

54. Maintenance Pro, a California corporation, was formed and incorporated by Fernandez to be the operating entity of the Los Angeles facility maintenance service business, which would then pay a commission to Fernandez's company, Facility Pro Inc. When Walis entered into this agreement with Fernandez, Fernandez was acting on behalf of himself and his partners, Jonathan Katz, Richard Waserstein, and Claudio Fernandez.

55. Fernandez, as the treasurer, at all times controlled the accounting and financial resources of Maintenance Pro.

56. In March 2014, Walis met with Claudio Fernandez to confirm the partnership agreement, which Claudio Fernandez confirmed, and soon thereafter Claudio Fernandez set up meetings with Walis, himself and other vendors to discuss

providing services for them in furtherance of the business.

57. After some time, Wal-Mart was impressed with the quality of work of the Los Angeles facility maintenance service business, so Wal-Mart requested additional services beyond interior floor services.

**The 1st MODIFICATION TO THE TERMS OF THE ORAL AGREEMENT FOR THE LOS ANGELES FACILITY MAINTENANCE SERVICE BUSINESS**

58. After Wal-Mart requested the additional services, Walis and Fernandez orally agreed to modify the original oral agreement so that any services, other then interior floor cleaning, would entitle Fernandez to receive a fee equal to 18% of the monthly gross revenues, while the commission for the interior floors would still remain at 12% of monthly gross revenues. The terms of the modified oral agreement for the Los Angels facility maintenance service business (hereinafter the 1st Modification to Oral Agreement") were:

a. Walis will provide the financial capital for the Los Angeles facility maintenance service business, including the startup cost of the business and the ongoing expenses of the business such as machinery and salaries. In addition, Walis will oversee and manage the business. However, as time went on Walis realized this was not the reality as Defendants Fernandez, Katz, Waserstein and Claudio had always intended to maintain complete control and were only attempting to fraudulently induce Walis;

b. Fernandez and his partners will provide general support for the Los Angeles facility maintenance service business based on his experience

c. Fernandez will be entitled to a commission fee of 12% (twelve) of the monthly gross revenue of the Los Angeles maintenance service business operations for services relating to interior floor cleaning, *and will be entitled to a commission fee of 18% (eighteen) of the monthly gross revenue for any services other then interior floor cleaning*;

d. Walis will be entitled to the profit that the Los Angeles facility maintenance service business generates.

59. The terms of this oral agreement are exemplified in numerous emails sent from Fernandez to Walis, including an email sent on June 4, 2014 with the subject line "CA Payment and FL Commission sheet" showing the 12% and 18% commission schedule. **SEE EXHIBIT 6.**

**The Growth Of The Los Angeles Facility Maintenance Service Business**

60. At the outset, the Los Angeles service maintenance business was providing interior floor cleaning services to one Wal-Mart store five nights a week. Within six weeks, the Los Angeles facility maintenance service business added a second Wal-Mart store. Soon after, the Los Angeles facility maintenance service business really took off and was servicing five Wal-Mart stores and each Wal-Mart store was being serviced five nights a week. The Los Angeles facility maintenance service business grew faster than expected and thus during this period so did the expenses and payroll.

**Cyclical Nature of Wal-Mart's Demands**

61. After about five months, the facility maintenance service business with Wal-Mart slowed down due to the seasonal nature of Wal-Mart's demands.

62. Walis believed this temporary slowdown was due to the seasonal nature of the business and was confident his business had a solid infrastructure of machinery and workers in place which would allow him to take advantage of the next uptick in the service demands of Wal-Mart.

63. As Walis had expected, the business began flaring back up in November of 2014. The business had four Wal-Mart stores servicing floors five nights a week, plus bathroom cleaning services and pressure washing services.

64. Fernandez noticed that the Los Angeles facility maintenance service business of which Walis was operating had become a success. Thus, Fernandez

wanted to grow the business even faster.

65. However, since the terms of the Oral Agreement and Modified Oral Agreement required that Walis pay for all the expenses, Walis was not in a position to grow the business at the pace that Fernandez wanted.

66. Fernandez, disregarding Walis' concerns, continued to pressure Walis into expanding the business at a rate beyond Walis' threshold. Fernandez knew that Walis did not have the resources to expand the business at the level Fernandez was demanding. Thus Fernandez used this knowledge to coerce Walis to either modify the original agreement in order to allow Fernandez to provide the necessary capital to expand or Fernandez would breach the terms of the Oral Agreement and withdraw his support for the Los Angeles facility service business. Ultimately Walis had no choice but to agree to Fernandez's demands so that Walis would not lose all the money he had already invested if Fernandez followed through on his threat and simply breached the Oral Agreement.

**The 2nd MODIFICATION TO THE TERMS OF THE ORAL AGREEMENT FOR THE LOS ANGELES FACILITY MAINTENANCE SERVICE BUSINESS**

67. The 2nd modification of the oral agreement changed the nature of the previous agreements, which were based on a commission approach to now being a straight-down-the-middle partnership in which each party is responsible for 50% of the expenses and entitled to 50% of the profits, with no commission fees being paid. The terms of the 2nd Modification to the Oral Agreement were as follows:

a. Walis and Fernandez and his partners will each be responsible fifty/fifty for the expenses of the Los Angeles maintenance service business.

b. Walis will oversee and manage the Los Angeles maintenance service operations;

c. Fernandez and his partners will provide general support to Los Angeles facility maintenance service business;

d. Walis and Fernandez and his partners will each be entitled to 50% of the profits generated by the Los Angeles maintenance service business.

68. The 2nd Modification to the Terms of the Oral Agreement became effective as of January 1, 2015.

69. In or about January of 2015, Fernandez came to Los Angeles for about a week to help with the implementation of new compliance procedures to ensure proper payment from the vendors were being received.

70. In the beginning months of 2015, the Los Angeles facility maintenance service business began to grow and was servicing about eleven interior floor jobs in addition to pressure washing services, bathroom cleaning services and numerous one-time services.

71. During this growth period in the first quarter of 2015, the Los Angeles facility maintenance service business was doing so well that at one point it was generating $450,000 a month in gross revenues.

**Defendant Fernandez Wanted a Bigger Share of the Action**

72. The success of the Los Angeles facility maintenance service business operation in which Walis had managed to build was not sitting well with Fernandez's ego and greed began to creep in for Fernandez. Fernandez was uncomfortable with the fact that the Los Angeles facility maintenance service business was doing more in gross revenue than Fernandez's Florida maintenance service business operation that Fernandez had been operating for over 10 years.

73. Fernandez was also not happy that Walis was receiving 50% of the profits of the business while Fernandez had to split his 50% portion of the business with his three other partners; Jonathan Katz, Richard Wasserstein and Claudio Fernandez.

74. This frustration on the part of Fernandez first began to surface in or about March or April of 2015 when Fernandez and Walis were in Las Vegas looking into the Las Vegas facility maintenance service market. During this trip, Fernandez

began to express to Walis his frustration that Walis was receiving 50% of the profits and Fernandez had to share his profits with his partners. On one occasion where it seemed Fernandez had consumed several alcoholic beverages at dinner, Fernandez began to tell Walis that the success of the Los Angeles maintenance service business was all because of Fernandez and Walis didn't deserve the share that he was receiving. At the time Walis did not think much of it and attributed the comments to the fact that Fernandez may have had a few too many drinks.

75. A few days later after Walis and Fernandez returned to Los Angeles, Fernandez stated to Walis that he wanted to renegotiate the terms of the 2nd Modified Oral Agreement because he didn't think it was fair that Walis received 50% of the profits and that Fernandez had to divide his 50% with his three other partners; Waserstein, Katz and Claudio Fernandez.

76. Walis was shocked and disappointed that Fernandez, his longtime friend, was not willing to uphold his end of the agreement in good faith. Walis expressed to Fernandez that he took all the initial risk in starting the LA facility maintenance service business and was not interested in renegotiating the existing agreement now that the LA facility maintenance service business was a success. When Fernandez heard that Walis was not interested in renegotiating the Agreement, Fernandez threated to pull the plug on his portion of further contributions, which would then essentially sabotage the business.

77. Walis was put into a bad predicament and worried that the business might sink if he did not acquiesce to Fernandez's demands. If the business did sink, Walis would lose all the money he that had already invested in the Los Angeles facility maintenance service business. Thus, Walis was forced under duress to accept the new terms that Fernandez demanded.

## The 3rd MODIFICATION TO THE TERMS OF THE ORAL AGREEMENT FOR THE LOS ANGELES FACILITY MAINTENANCE SERVICE BUSINESS

78. The terms of the 3rd modification of the Oral Agreement were:

a. For Floor Cleaning Services: Walis will be responsible for 40% of the expenses and will be entitled to 40% of the profits for any services related to interior floor cleaning of the Los Angeles facility maintenance service business. Fernandez and his partners will be responsible for 60% of the expenses and will be entitled to 60% of the profits for any services related to interior floor cleaning.

b. For Services Other Than Floor Cleaning: Walis will be responsible for 33% of the expenses and will be entitled to 33% of the profits for any services *other than* floor interior cleaning. Fernandez and his partners will be responsible for 67% of the expenses and will be entitled to 67% of the profits for any services *other than* interior floor cleaning.

c. Walis will oversee and manage the Los Angeles maintenance service business;

d. Fernandez and his partners will provide general support to the Los Angeles facility maintenance service business.

**Slowdown Again**

79. Due to the seasonal nature of Wal-Mart's demands, the business slowed again in or about March of 2015. This time around, when Wal-Mart cut back its demand for services, Walis and Fernandez had differing opinions on how to handle the employees. Walis wanted to keep the workers' morale high and keep the workers on staff knowing that business would pick back up again soon as it always had in the past. On the other hand, Fernandez wanted to terminate almost all of the employees until business picked up again.

80. During this period in which business was slow, the checks that Fernandez was writing to the business for his share of the expenses routinely began to bounce, which in turn caused the employees to not receive compensation on time. On information and belief, when Walis requested clarification from Fernandez as to why the checks are bouncing, Fernandez indicated that Waserstein was delaying the

release of funds.

81. In or about April of 2015, Fernandez came to Los Angeles to discuss the Los Angeles facility maintenance service business operations with Walis. A few days after arriving in Los Angeles, Fernandez emailed and called Walis on April 13, 2015, stating that he intended to breach the terms of the 3rd Modified Oral Agreement by withdrawing any further contributions on his part to the business and that he wanted to shut the entire business down and terminate all of the employees. Fernandez stated to Walis that since he was choosing to shut down the LA facility maintenance service business, Fernandez would make sure everyone is made whole and paid their respective shares due. At that time Walis was owed in excess of $200,000 in profits plus the business buyout.

82. Fernandez stated to Walis that he would be meeting with all the Wal-Mart store managers in Los Angeles to personally inform them that he would be ending their working relationship, but that Fernandez wanted to do this on amicable terms so that Fernandez's Florida business with Wal-Mart would remain in good standing.

83. Fernandez and his partners never intended to shut down the Los Angeles facility maintenance service business, and never intended to pay Walis the amounts promised. In actuality, Fernandez and his partners are still running Los Angeles facility maintenance service business and reaping all the rewards that Walis risked with his own money to build at the outset.

84. Fernandez and his partners misled Walis into thinking that the Los Angeles facility maintenance service business was being terminated so that Fernandez and his partners can buy Walis out for a nominal payment and take over the business.

85. Fernandez repeatedly assured Walis that he would get the monies he is owed, and to that end, Fernandez told Walis to contact Peter Popovich who is Fernandez's bookkeeper.

86. Popovich initially sent Walis a PDF on July 17, 2015, ratified and approved by Fernandez, showing that the Los Angeles facility maintenance service business

had a profit of $72,231.47, and thereby Walis was owed half of that amount, equaling $36,115.74. **SEE EXHIBIT 7.** The figure stated in the first PDF was very low compared to the real amount Walis was owed.

87. Popovich sent a second PDF on August 31, 2015, ratified and approved by Fernandez, showing that the Los Angeles facility maintenance service business had a profit of $168,987.85, and thereby Walis was owed half of that amount, equaling $84,493.93. **SEE EXHIBIT 8.**

88. Popovich sent a second PDF on September 8, 2015, ratified and approved by Fernandez, showing that the Los Angeles facility maintenance service business had a profit of $221,164.68, and thereby Walis was owed half of that amount, equaling $110,582.34. **SEE EXHIBIT 9.**

89. these figures sent by Popovich, ratified and approved by Fernandez, are all low-ball figures intended to deceive Walis out of the actual amount of profit he is owed.

90. Had Walis known that Fernandez never intended to carry out his end of the oral agreement in good faith, Walis would have never entered into the agreement with Fernandez and invest such heavily out of his own pocket. Fernandez used his position of trust and faith as Walis' longtime friend to lure Walis into setting up, creating, and building the Los Angeles facility maintenance service business only to later continually strong-arm Walis into changing the terms of the agreement to Fernandez's favor. Fernandez ultimately breached his duty of honesty and loyalty by misrepresenting to Walis that the Los Angeles facility maintenance service business was being shut down.

91. Fernandez never had any intention to actually shut down the business. In reality Fernandez only wanted to take over the business for himself at a minimal cost.

92. Fernandez did not enter into the agreement in good faith because he never intended to hold his end of the original agreement. Fernandez lured and induced

Walis into spending his own capital to grow the business and then once the business was successful, Fernandez tried to take a larger portion of the business for himself.

93. Fernandez's scheme was to have Walis provide all the upfront money and take all the financial risk of failure, and then when Fernandez felt comfortable that the business would be successful he would step in and take over the business.

94. Fernandez ended the business and breached the agreement by suddenly indicating that he was withdrawing funding for the Los Angeles facility maintenance service business and acted in bad faith in doing so. Furthermore, Fernandez acted in bad faith because he never intended to deal fairly and never actually intended to end the Los Angeles facility maintenance service business but rather to take it over for himself and his partners, Jonathan Katz, Richard Waserstein, and Claudio Fernandez

95. Fernandez's partners, Jonathan Katz, Richard Waserstein, and Claudio Fernandez were aware of, and indeed, participated in inducing Walis to provide all the upfront money and take all the financial risk of failure for the Los Angeles facility maintenance service business and were aware of, and indeed, acted in in bad faith because they never intended to deal fairly and never actually intended to end the Los Angeles facility maintenance service business but rather wanted to take it over for themselves.

96. Walis is owed damages in excess of $200,000 for his portion of the profits that Fernandez promised to pay. Walis is entitled to a buy-out amount for his portion of the business partnership and Walis is entitled to a sum representing the future earnings.  Walis is owed all sums which the business partnership had earned from Walmart and other clients which were outstanding as accounts receivable at the time of Fernandez's breach. Finally, Walis is owed reimbursement for his contribution to the equipment of the business.

97. Defendants have been unjustly enriched by their deceitful conduct in the sum of $200,000 or more.

## FIRST CAUSE OF ACTION FOR BREACH OF ORAL CONTRACT

## (AGAINST ALL DEFENDANTS)

98. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 97 and all other paragraphs set forth above, and incorporates same as though set forth in full.

### Terms Of The Oral Agreement For The Los Angeles Facility Maintenance Service Business

99. The terms of the partnership were originally defined by the oral agreement for the Los Angeles facility maintenance service business joint venture (the "Oral Agreement") were as follows:

a. Walis will provide the financial capital for the Los Angeles facility maintenance service business, including the startup costs of the business and the ongoing expenses of the business such as machinery and salaries. In addition, Walis will oversee and manage the Los Angeles facility maintenance service business;

b. Fernandez and his partners will provide general support for the Los Angeles facility maintenance service business based on his experience;

c. Fernandez and his partners will be entitled to a 12% commission of the monthly gross revenue of the Los Angeles facility maintenance service business;

d. Walis will be entitled to the profits that the Los Angeles facility maintenance service business generates.

100. Walis and Fernandez agreed to modify the Oral Agreement and the termsof the 1st Modification to Oral Agreement were:

a. Walis will provide the financial capital for the Los Angeles facility maintenance service business, including the startup costs of the business and the ongoing expenses of the business such as machinery and salaries. In addition, Walis will oversee and manage the Los Angeles facility maintenance service business;

b. Fernandez and his partners will provide general support for the Los Angeles

facility maintenance service business based on his experience

c. Fernandez and his partners will be entitled to a commission fee of 12% (twelve) of the monthly gross revenue of the Los Angeles maintenance service operations for services relating to interior floor cleaning, *and will be entitled to a commission fee of 18% (eighteen) of the monthly gross revenue for any services other then interior floor cleaning*;

d. Walis will be entitled to the profits the Los Angeles facility maintenance service business generates.

101. Walis and Fernandez agreed to modify the 1st Modification to the Oral Agreement and the terms of the 2nd Modification to Oral Agreement were:

a. Walis and Fernandez and his partners will each be responsible fifty/fifty for the expenses of the Los Angeles maintenance service business.

b. Walis will oversee and manage the Los Angeles maintenance service operations;

c. Fernandez and his partners will provide general support to the Los Angeles facility maintenance service business;

d. Walis and Fernandez and his partners will each be entitled to 50% of the profits generated by the Los Angeles maintenance service business.

102. Terms of the 3rd Modification to Oral Agreement were:

a. For Floor Cleaning Services: Walis will be responsible for 45% of the expenses and will be entitled to 45% of the profits for any services related to interior floor cleaning. Fernandez and his partners will be responsible for 55% of the expenses and would be entitled to 55% of the profits for any services related to interior floor cleaning.

b. For Services Other Than Floor Cleaning: Walis will be responsible for 33% of the expenses and will be entitled to 33% of the profits for any services *other than* floor interior cleaning. Fernandez and his partners will be responsible for 67% of the expenses and entitled to 67% of the profits for any services *other than* interior

floor cleaning.

c. Walis will oversee and manage the Los Angeles maintenance service Los Angeles facility maintenance service business;

d. Fernandez and his partners will provide general support to the Los Angeles facility maintenance service business.

103. Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement.

104. Defendants, each and all of them, breached the Agreement with Plaintiff by failing to perform as specified under the terms of the Agreement.

a. Specifically, Defendants, each and all of them, simply stated that they will no longer be honoring their responsibility for their portion of expenses and will be shutting the business down.

b. Further, Walis has not received the amounts due to him for his portion of the profits.

105. As a result of Defendant's breach of the Agreement, Plaintiff has been damaged as alleged herein by loss of monies owed, expenses incurred in attempting to remedy the breach, and the expenses he will continue to incur in connection therewith, as proven at trial.

**SECOND CAUSE OF ACTION FOR FRAUD AND DECEIT BASED ON INTENTIONAL MISREPRESENTATION (Cal. Civ. Code 1710 et. Seq.)**

**(AGAINST ALL DEFENDANTS)**

106. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 105 and all other paragraphs set forth above, and incorporates same as though set forth in full.

107. on or about February 14, 2014, Fernandez, acting on behalf of his partners and himself, fraudulently told Walis that he could take advantage of the opportunity to use Fernandez's experience and connections with Wal-Mart to create a facility

maintenance service business in Los Angles in exchange for paying Fernandez a commission fee equal to 12% of monthly gross revenues that such venture generated. When Fernandez made these misrepresentations, he knew that they were false and did so in order to defraud Walis, by later trying little by little to take over the entire business from Walis once Fernandez felt the business was a success. At the time, Walis believed the misrepresentations made by Fernandez. Had Walis known that the representations made by the Defendants, each and all of them, were false, he would have never entered into the agreement to try and build a facility maintenance service business in Los Angeles.

108. Walis and Fernandez were long time friends, thereby allowing Fernandez to gain Walis' trust. Thereafter, Fernandez used his position of trust to pressure Walis into agreeing to begin a facility maintenance service business in Los Angeles. In or about March of 2015, Fernandez cut Walis out of the Los Angeles facility maintenance service business by stating he was withdrawing further financial contributions and shutting the business down. On information and belief, Fernandez misrepresented that he was going to be terminating the business and misrepresented that he would pay Walis the share of the company that he was due.

109. On information and belief, when Fernandez made these representations, he knew them to be false and made these representations and actions with the intention to deceive and defraud the Plaintiff and to induce the Plaintiff, with the expectation that the Plaintiff would so act.

110. On information and belief, the Plaintiff, at the time these representations were made and actions taken by Fernandez, was ignorant of the falsity of the representations and believed them to be true. In reliance on these representations, the Plaintiff has been damaged approximately $200,000 in addition to the loss of monies owed. Had the Plaintiff known the actual facts, he would never have entered into this Agreement with Fernandez. The Plaintiff's reliance on Fernandez's representations, as alleged herein, was justified because Fernandez held himself out

to be a well-seasoned professional in the maintenance business and a longtime friend of Walis.

111. As a proximate result of the fraudulent conduct of Fernandez, as herein alleged, Plaintiff has been damaged in a sum to be proven at trial.

112. Fernandez's actions, as herein alleged, were wanton and despicable, done with a callous disregard for the Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

**THIRD CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION**

**(AGAINST ALL DEFENDANTS)**

113. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 112 and all other paragraphs set forth above, and incorporates same as though set forth in full.

114. These representations of Fernandez were untrue, in that the true facts were that the Fernandez was never going to honor the terms of the agreement or repay Walis the amounts owed to him.

115. By taking the actions noted above, Fernandez induced Walis to enter into the Agreement and believe Fernandez would act in good faith.

116. As a proximate result of Fernandez's negligence, the Plaintiff was damaged. As result of Fernandez's wrongdoing, Plaintiff has been harmed in a sum to be proven at trial.

**FOURTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY**

**(AGAINST ALL DEFENDANTS)**

117. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 116 and all other paragraphs set forth above, and incorporates same as though set forth in full.

118. A fiduciary relationship has been defined as one founded on trust or confidence reposed by one person in the integrity and fidelity of another. Fiduciary

duties constitute the highest standard of duty imposed by the law. As a partner, the partner owes his other partners, the duties of reasonable care, utmost good faith, integrity and loyalty. The partner is also required to disclose all facts within his knowledge which are material to the transaction he is effecting for his partners or the overall relationship of the partnership.

119. Fernandez advised the Plaintiff that the partnership that they had entered into as described above and the corresponding Los Angeles facility maintenance service business would be terminated and that Fernandez would be withdrawing all financial support for the business.

120. Fernandez's false and misleading representations to the Plaintiff were a clear breach of the fiduciary duty owed to the Plaintiff. Fernandez had a duty to disclose material facts in connection with the business. Fernandez omitted to disclose that he was not really closing the business down, but was rather taking it over for himself. In doing the above-mentioned transactions, Fernandez put his own interest first in order to wrongfully obtain $200,000 at the expense of the Plaintiff.

121. The breach of the fiduciary duty has damaged Claimant in an amount to be proven at trial, in excess of $200,000.

**FIFTH CAUSE OF ACTION FOR CONSTRUCTIVE FRAUD §1573**

**(AGAINST ALL DEFENDANTS)**

122. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 121 and all other paragraphs set forth above, and incorporates same as though set forth in full.

123. Constructive fraud "arises on a breach of duty by one in a confidential or fiduciary relationship to another which induces justifiable reliance by the latter to his prejudice." *Odorizzi v Bloomfield Sch. Dist.* (1966) 246 CA2d 123, 129, 54 CR 110. The relationship between the parties need not be a formal fiduciary relationship to constitute a basis for a constructive fraud claim. Constructive fraud

may also arise in the context of nonfiduciary "confidential" relationships. A confidential relationship may be present whenever someone justifiably places trust and confidence in the good faith and integrity of another person. _Tyler v Children's Home Soc'y_ (1994) 29 CA4th 511, 549, 35 CR2d 291; _Odorizzi_, 246 CA2d at 129. As long as there is no direct evidence that the plaintiff did *not* rely on the defendant's misrepresentation or nondisclosure, reasonable reliance may be presumed, again based on the parties' fiduciary or confidential relationship. _Estate of Gump_ (1991) 1 CA4th 582, 601, 2 CR2d 269.

124. On information and belief, Fernandez not only held himself out as a professional in the maintenance business but he was also Plaintiff's good friend and partner in the Los Angeles facility maintenance service business, which would give rise to a fiduciary duty. Plaintiff justifiably placed trust and confidence in the good faith and integrity of Fernandez's representations and advice to his detriment.

125. Fernandez's false and misleading representations to the Plaintiff were a clear breach of the duty owed to the Plaintiff. Fernandez had a duty to disclose material facts in connection with the business. Fernandez failed to disclose with any advance warning that he would be suddenly withdrawing all financial support for the Los Angeles facility maintenance service business. Fernandez omitted to disclose that he was <u>not</u> actually shutting down the Los Angeles facility maintenance service business. In doing the above-mentioned transactions, Fernandez put his own interest first in order to wrongfully obtain $100,000 at the expense of the Plaintiff and wrongfully takeover the business.

126. As result of Fernandez's wrongdoing, the Plaintiff was financially damaged in a sum to be proven at trial.

127. Fernandez's actions, as herein alleged, were wanton and despicable, done with a callous disregard for the Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## SIXTH CAUSE OF ACTION FOR FRAUDULENT DECEPTION CC §1572(5)

## (AGAINST ALL DEFENDANTS)

128. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 127 and all other paragraphs set forth above, and incorporates same as though set forth in full.

129. On information and belief, on or about February 13, 2014, Fernandez, acting on behalf of his partners and himself, intended to fraudulently deceive Plaintiff by representing to Plaintiff that Fernandez would repay Plaintiff the money that was owed to him for his portion of the Los Angeles facility maintenance service business. This promise was further confirmed by numerous emails sent from Popovich, and ratified by Fernandez. When Fernandez made these misrepresentations he knew that they were false and did so in order to deceive Plaintiff, by later wrongfully taking over the business, and wrongfully not repaying Plaintiff. Had Plaintiff known the representations made by the Defendants were false, he would have never agreed to enter into the Agreement.

130. On information and belief, Fernandez used his position of trust as Plaintiff's longtime friend and as a professional in the maintenance business to lull Plaintiff into a false sense of security. Plaintiff trusted that the Defendant, as a professional and his longtime friend, was advising him truthfully regarding the terms and promises under the Agreement. In or about April of 2015, Fernandez said he was terminating the business partnership and since has wrongfully withheld the monies owed to Walis. On information and belief, Fernandez knew that he was not going to actually terminate the business and was not going to pay Plaintiff the sums due.

131. On information and belief, when Fernandez made these representations, he knew them to be false and made these representations and actions with the intention to deceive and defraud the Plaintiff and to induce the Plaintiff with the

expectation that the Plaintiff would so act.

132. On information and belief, the Plaintiff at the time these representations were made and actions taken by Fernandez, was ignorant of the falsity of the representations and believed them to be true. In reliance on these representations, the Plaintiff trusted that the Defendants, each and all of them, would honor his end of the Agreement, only to later find out Defendants, each and all of them, had other plans. Had the Plaintiff known the actual facts, he would never have entered into this Agreement with Fernandez. The Plaintiff's reliance on Fernandez's representations, as alleged herein, was justified because Fernandez held himself out to be a trusted friend and a well-seasoned professional in the maintenance business.

133. As a proximate result of the fraudulent conduct of Fernandez, as herein alleged, Plaintiff has been financially damaged in a sum to be proven at trial.

134. Fernandez's actions, as herein alleged, were wanton and despicable, done with a callous disregard for the Plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## SEVENTH CAUSE OF ACTION FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

## (AGAINST ALL DEFENDANTS)

135. Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 134 and all other paragraphs set forth above, and incorporates same as though set forth in full.

136. The terms of the partnership were originally defined by the oral agreement for the Los Angeles facility maintenance service business joint venture (the "Oral Agreement") were as follows:

a. Walis will provide the financial capital for the business, including the startup costs of the business and the ongoing expenses of the business such as machinery and salaries. In addition, Walis will oversee and manage the business;

b. Fernandez and his partners will provide general support for the business

based on his experience

c. Fernandez and his partners will be entitled to a 12% commission of the monthly gross revenue of the Los Angeles facility maintenance service business;

d. Walis will be entitled to any profits the Los Angeles facility maintenance service business generates.

137. Walis and Fernandez agreed to modify the Oral Agreement and the terms of the 1st Modification to Oral Agreement were:

a. Walis will provide the financial capital for the business, including the startup costs of the business and the ongoing expenses of the business such as machinery and salaries. In addition, Walis will oversee and manage the business;

b. Fernandez and his parntners will provide general support for the business based on his experience

c. Fernandez and his partnerswill be entitled to a commission fee 12% (twelve) of the monthly gross revenue of the Los Angeles maintenance service operations for services relating to interior floor cleaning, *and will be entitled to a commission fee of 18% (eighteen) of the monthly gross revenue for any services other then interior floor cleaning*;

d. Walis will be entitled to any profits that the Los Angeles facility maintenance service business generates.

138. Walis and Fernandez and his partners agreed to modify the 1st Modification to the Oral Agreement and the terms of the 2nd Modification to Oral Agreement were:

a. Walis and Fernandez and his partners will each be responsible fifty/fifty for the expenses of the Los Angeles maintenance service business.

b. Walis will oversee and manage the Los Angeles maintenance service business operations;

c. Fernandez and his partners will provide general support;

d. Walis and Fernandez will each be entitled to 50% of the profits generated by

the Los Angeles maintenance service business.

139. Walis and Fernandez and his partners agreed to modify the 2nd Modification to the Oral Agreement and the terms of the 3rd Modification to Oral Agreement were:

a. For Floor Cleaning Services: Walis will be responsible for 45% of the expenses and entitled to 45% of the profits for any services related to interior floor cleaning. Fernandez and his partners will be responsible for 55% of the expenses and entitled to 55% of the profits for any services related to interior floor cleaning.

b. For Services Other Than Floor Cleaning: Walis will be responsible for 33% of the expenses and entitled to 33% of the profits for any services *other than* floor interior cleaning. Fernandez and his partners will be responsible for 67% of the expenses and entitled to 67% of the profits for any services *other than* interior floor cleaning.

c. Walis will oversee and manage the Los Angeles maintenance service business;

d. Fernandez and his partners will provide general support.

140. On information and belief, Plaintiff has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of this Agreement.

141. Defendants, each and all of them, breached their duty of good faith by failing to perform in a fair manner under the terms of the Agreement and depriving the Plaintiff of the benefit of the Agreement.

a. Specifically, Defendants simply stated that they would no longer be honoring their responsibility for their portion of expenses and would be shutting the business down without any advance warning to Defendant.

b. Further, Walis has not received the amounts due to him for his portion of the profits that Fernandez promised.

142.As a result of Defendant's breach of the duty of good faith, Plaintiff has

been damaged as alleged herein by loss of monies owed, expenses incurred in attempting to remedy the breach; and the expenses he will continue to incur in connection therewith, as proven at trial.

**EIGHTH CAUSE OF ACTION**

**(ALTERNATIVELY FOR UNJUST ENRICHMENT AGAINST ALL DEFENDANTS)**

143.Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 142 and all other paragraphs set forth above, and incorporates same as though set forth in full.

144. By virtue of the nature of Defendants' actions, they have obtained benefits that they may not justly retain. Defendants have been enriched by monies received by Wal-Mart in excess of $200,000 and $100,000 provided for the equipment paid for by Walis, without conferring any benefit upon Plaintiff in exchange.

145. If Defendants, each and all of them, are not required to perform under the agreement, they will be unjustly enriched in an amount of $260,000, or more.

**WHEREFORE, Plaintiff prays for judgment as follows:**

**ON THE FIRST CAUSE OF ACTION:**

1. For general damages in excess of the Court's jurisdiction, according to proof;
2. For special damages in excess of the Court's jurisdiction, according to proof;
3. For interest thereon at the legal rate according to proof;

**ON THE SECOND CAUSE OF ACTION:**

1. For general damages in excess of the Court's jurisdiction, according to proof;
2. For special damages in excess of the Court's jurisdiction, according to proof;
3. For interest thereon at the legal rate according to proof;
4. For exemplary and punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

**ON THE THIRD CAUSE OF ACTION:**

1. For general damages in excess of the Court's jurisdiction, according to proof;
2. For special damages in excess of the Court's jurisdiction, according to proof;
3. For interest thereon at the legal rate according to proof;

**ON THE FOURTH CAUSE OF ACTION:**

1. For general damages in excess of the Court's jurisdiction, according to proof;
2. For special damages in excess of the Court's jurisdiction, according to proof;
3. For interest thereon at the legal rate according to proof;

**ON THE FIFTH CAUSE OF ACTION:**

1. For general damages in excess of the Court's jurisdiction, according to proof;
2. For special damages in excess of the Court's jurisdiction, according to proof;
3. For interest thereon at the legal rate according to proof;
4. For exemplary and punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

**ON THE SIXTH CAUSE OF ACTION:**

1. For general damages in excess of the Court's jurisdiction, according to proof;
2. For special damages in excess of the Court's jurisdiction, according to proof;
3. For interest thereon at the legal rate according to proof;
4. For exemplary and punitive damages in an amount appropriate to punish; Defendants and deter others from engaging in similar misconduct;

**ON THE SEVENTH CAUSE OF ACTION:**

1. For general damages in excess of the Court's jurisdiction, according to proof;
2. For special damages in excess of the Court's jurisdiction, according to proof;
3. For interest thereon at the legal rate according to proof;

**ON THE EIGHTH CAUSE:**

1. Alternatively, for the sum of $400,000.00;

**ON ALL CAUSES OF ACTION**

1. For costs of suit and disbursements incurred herein;

2. For prejudgment interest and post judgment interest at the legal rate; and

3. Such other and further relief as the court may deem just and proper.

Dated: April 22, 2016

**SMS LAW GROUP**

**NAVAB LAW**

By: /S/ Kaveh Navab

Kaveh Navab

Adi Sarbaz

Attorneys for Plaintiff